[ORAL ARGUMENT NOT YET SCHEDULED]

## No. 15-5183

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

AMERICAN CIVIL LIBERTIES UNION and
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,

*Appellants*,

v.

CENTRAL INTELLIGENCE AGENCY, *et al.*,

*Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR PLAINTIFFS–APPELLANTS**

Arthur B. Spitzer
American Civil Liberties Union of the
   Nation's Capital
4301 Connecticut Avenue, NW–Suite 434
Washington, DC 20008
T: 202.457.0800
F: 202.452.1868
artspitzer@aclu-nca.org

Hina Shamsi
Ashley Gorski
American Civil Liberties Union
   Foundation
125 Broad Street–18th Floor
New York, New York 10004
T: 212.549.2500
F: 212.549.2654
hshamsi@aclu.org

*Counsel for Appellants*
November 16, 2015

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiffs–Appellants American Civil Liberties Union and American Civil Liberties Union Foundation certify as follows:

## A. Parties and Amici

The Appellants (Plaintiffs below) are the American Civil Liberties Union and American Civil Liberties Union Foundation. The Appellees (Defendants below) are the Central Intelligence Agency, Department of Defense, Department of Justice, and Department of State. There were no amici before the district court, and none are currently anticipated in this appeal.

## B. Ruling Under Review

The ruling under review is the portion of the district court's order of May 20, 2015 (Boasberg, J.), granting Defendants' motion to dismiss. The district court issued an opinion together with the order on May 20, 2015, which is available at 2015 WL 2406825 (D.D.C. May 20, 2015).

## C. Related Cases

This case has not previously been before this or any other court. Counsel for appellant are not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

Respectfully submitted,

*/s/ Hina Shamsi*
Hina Shamsi
*Counsel for Plaintiffs–Appellants*


Date: November 16, 2015

# CORPORATE DISCLOSURE STATEMENT

American Civil Liberties Union, Inc. and American Civil Liberties Union Foundation, Inc. are affiliated non-profit corporations devoted to defending and expanding civil liberties and civil rights in the United States. No publicly held company, or any other party, holds any ownership interest in either organization. American Civil Liberties Union, Inc. is a membership organization with no parent company. The directors of American Civil Liberties Union Foundation, Inc. are selected, indirectly, by American Civil Liberties Union, Inc. No other party controls American Civil Liberties Union Foundation, Inc., directly or indirectly.

Respectfully submitted,

*/s/ Hina Shamsi*
Hina Shamsi
*Counsel for Plaintiffs–Appellants*

Date: November 16, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ......................................................................................v

STATEMENT OF JURISDICTION...................................................1

STATEMENT OF THE ISSUE..........................................................1

STATEMENT OF THE CASE............................................................1

    A.    Initiation of SSCI investigation into CIA abuses.........................2

    B.    The SSCI's *Committee Study of the CIA's Detention
    and Interrogation Program* ......................................................3

    C.    The SSCI's release of the Executive Summary
    and transmittal of the Final Report ............................................6

    D.    The ACLU's FOIA requests and suit.........................................9

    E.    Senator Burr's request for return of the Final Report ................11

    F.    The district court's judgment ...................................................12

SUMMARY OF THE ARGUMENT ..................................................13

STANDARD OF REVIEW ...............................................................17

ARGUMENT .....................................................................................18

    I.    The Final Report is an agency record subject to FOIA ..............18

        A.    The district court erred by failing to require Defendants
        to show a "clear assertion" of congressional control .........................21

        B.    Congress did not retain control over the Final Report......................23

            1.    The SSCI's June 2009 letter does not relate
            to the Final Report.........................................................24

            2.    The December 2014 transmittal letter and other
            contemporaneous evidence reflect Congress's intent
            to relinquish control of the Final Report........................28

            3.    The fact that Congress did not seek to declassify
             the Final Report for public release is not significant ....................31

i

C.   Defendants may use and dispose of the Final Report
as they see fit .................................................................................36

1.   Senator Burr's post-hoc attempt to assert
control over the Final Report is irrelevant ...................................37

2.   Defendants' unilateral decision to limit dissemination
of the report is irrelevant ...............................................................39

CONCLUSION ...................................................................................40

CERTIFICATE OF COMPLIANCE ....................................................42

CERTIFICATE OF SERVICE .............................................................43

ADDENDUM ................................................................................. A-1

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Dep't of Defense*,
   339 F. Supp. 2d 501 (S.D.N.Y. 2004)................................................................2

*Burka v. U.S. Dep't of Health and Human Servs.*,
   87 F.3d 508 (D.C. Cir. 1996) ....................................................... 19, 20

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976) ........................................................................18

*Goland v. CIA*,
   607 F.2d 339 (D.C. Cir. 1978) ....................................... 20, 22, 30, 31, 33, 34, 37

*Herbert v. Nat'l Acad. of Scis.*,
   974 F.2d 192 (D.C. Cir. 1992) .....................................................17

*Holy Spirit Ass'n for the Unification of World Christianity v. CIA*,
   636 F.2d 838 (D.C. Cir. 1980) ............................................... 21, 30, 38

*Judicial Watch, Inc. v. Dep't of Commerce*,
   34 F. Supp. 2d 28 (D.D.C. 1998) ............................................... 20, 39

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ............................................ 19, 20, 21

*Nat'l Archives & Records Admin. v. Favish*,
   541 U.S. 157 (2004) ........................................................................18

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) ............................................................... 18, 40

*Paisley v. CIA*,
   712 F.2d 686, (D.C. Cir. 1983) ................................ 20, 21, 27, 30, 31, 33, 38, 39

*United We Stand Am., Inc. v. IRS*,
   359 F.3d 595 (D.C. Cir. 2004) ............................................ 20, 21, 23, 30, 31, 38

Authorities upon which Plaintiffs chiefly rely are marked with asterisks.

**Statutes**

5 U.S.C. § 551 ................................................................................ 18

5 U.S.C. § 552 ...................................................................... 1, 18, 36

5 U.S.C. §§ 701–706 .........................................................................1

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

**Regulations**

32 C.F.R. 1908.01 ...........................................................................35

**Rules**

Federal Rule of Civil Procedure 12(b)(1) .......................................11

Senate Intelligence Committee Rule 9.7..........................................38

**Other Authorities**

160 Cong. Rec. S6405 (daily ed. Dec. 9, 2014) ..........................4, 8

Exec. Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009) ...........................33

# GLOSSARY

| | |
|---|---|
| **ACLU** | American Civil Liberties Union |
| **CIA** | Central Intelligence Agency |
| **Final Report** | SSCI, *Committee Study of the CIA's Detention and Interrogation Program*, Dec. 3, 2014 |
| **FOIA** | Freedom of Information Act |
| **Initial Report** | SSCI, *Committee Study of the CIA's Detention and Interrogation Program*, Dec. 3, 2012 |
| **SSCI** | Senate Select Committee on Intelligence |
| **Updated Report** | SSCI, *Committee Study of the CIA's Detention and Interrogation Program*, April 3, 2014 |

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 5 U.S.C. § 552 (a)(4)(B), 28 U.S.C. § 1331, and 5 U.S.C. §§ 701–706. That court granted Defendants' motion to dismiss and entered judgment for Defendants on May 20, 2015. JA 140. Plaintiffs the American Civil Liberties Union and American Civil Liberties Union Foundation (together, the "ACLU") timely filed a notice of appeal on June 26, 2015. JA 167. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The issue on appeal is whether the full investigative report on the Central Intelligence Agency's now-discontinued program of detention, torture, and other abuse of detainees, authored by the Senate Select Committee on Intelligence and transmitted to the executive branch for its use and dissemination, is an "agency record" subject to the Freedom of Information Act.

## STATEMENT OF THE CASE

The ACLU brought this Freedom of Information Act ("FOIA") lawsuit to vindicate the right of the American public to a critically important document in Defendants' possession: a 6,963-page report concerning Defendant CIA's former program of detention, torture, and other abuse of detainees. This report (the "Final Report") is the product of the Senate Select Committee on Intelligence ("SSCI"),

1

which conducted a comprehensive investigation into the CIA's torture program.

The Final Report describes widespread and horrific human rights abuses by the

CIA. It also details the CIA's evasions and misrepresentations to Congress, the

White House, the courts, the media, and the American public.

### A.     Initiation of SSCI investigation into CIA abuses.

The SSCI began to investigate CIA abuses when it learned from a December

6, 2007 *New York Times* article that the CIA had destroyed videotapes of certain

abusive interrogations, despite the objections of then-President Bush's White

House Counsel and the then-Director of National Intelligence. *See* Press Release,

Sen. Feinstein, Statement on Intel Committee's CIA Detention, Interrogation

Report (Mar. 11, 2014), http://1.usa.gov/1GdfNhk ("Sen. Feinstein Statement").[2]

According to Senator Dianne Feinstein, an initial SSCI investigation arising out of

the CIA's destruction of the tapes found that "interrogations and the conditions of

confinement at the CIA detention sites were far different and far more harsh than

the way the CIA had described them to us." *Id*. Subsequently, on March 5, 2009,

the SSCI voted 14-to-1 to initiate a comprehensive review of the CIA's detention

and interrogation program. *See id*.

---

[2] The CIA destroyed those tapes even though they were covered by a federal court order to the agency to "produce or identify all responsive documents" to a FOIA request seeking records related to the treatment of detainees apprehended after September 11, 2001 and held in U.S. custody abroad. *See ACLU v. Dep't of Defense*, 339 F. Supp. 2d 501, 505 (S.D.N.Y. 2004).

2

The SSCI's investigation involved the review of approximately six million pages of CIA documents and lasted more than three years. *See* Executive Summary, *Committee Study of the CIA's Detention and Interrogation Program*, Dec. 3, 2014, http://1.usa.gov/1wy9dw9 (together with the SSCI's Findings and Conclusions, the "Executive Summary").[3]

### B.  The SSCI's *Committee Study of the CIA's Detention and Interrogation Program*.

The SSCI approved an initial version of its investigative report, *Committee Study of the CIA's Detention and Interrogation Program* ("Initial Report"), on December 13, 2012. Upon the Committee's adoption of the Initial Report, then-Chairman Feinstein said that the study "uncovers startling details about the CIA detention and interrogation program and raises critical questions about intelligence

---

[3] In the course of the SSCI investigation, CIA personnel on two occasions removed from the Committee's files nearly 1,000 pages of documents that had been provided to the Committee, in violation of an agreement between the Committee and the CIA. In a separate incident, the CIA revoked the SSCI's access to the "Panetta Review," a series of internal CIA reports on certain agency records provided to the SSCI for its investigation. These actions, and a "search" by CIA personnel of SSCI computers, raised "grave concerns" about the CIA's violation of "the separation of powers principles embodied in the United States Constitution" and its undermining of "the constitutional framework essential to effective congressional oversight of intelligence activities." Sen. Feinstein Statement; *see also* Carolyn Lochhead, *Feinstein Winning Fight with CIA, Obama Over Torture Report*, S.F. Gate, Aug. 9, 2014, http://bit.ly/1opwhPn ("John McCain of Arizona and Lindsey Graham of South Carolina[] sprang to Feinstein's defense in an Aug. 1 press conference. McCain accused the CIA of 'violating the fundamental barriers of constitutional authority' and acting like a 'rogue agency.'").

operations and oversight." Press Release, Sen. Feinstein, Feinstein Statement on

CIA Detention, Interrogation Report (Dec. 13, 2012), http://1.usa.gov/SXEWHH.

 After adopting the Initial Report, the Committee sent it to executive branch

agencies for review and comment. In a transmittal letter accompanying the report,

the SSCI explained that it was soliciting from executive branch agencies

"suggested edits or comments." Letter, Sen. Dianne Feinstein to The Hon. Barack

Obama, Dec. 14, 2012, ECF No. 41-1, JA 127. The SSCI also limited

dissemination of the Initial Report within the executive branch. *See* Higgins Decl.

¶ 14, ECF No. 17-2, JA 20; Ex. E to Higgins Decl., ECF No. 39-1, JA 98.

 In June 2013, the CIA sent the SSCI an official response to the Initial

Report, which has since been publicly released. *See* CIA, June 2013 Response to

the SSCI Study on the Former Detention and Interrogation Program,

http://1.usa.gov/12JxFDk.

 Once the SSCI received feedback from the CIA, as well as the views of

minority members of the Committee, in April 2014, it revised the Initial Report,

and created an updated version ("Updated Report"). *See* 160 Cong. Rec. S6405–10

(daily ed. Dec. 9, 2014), http://1.usa.gov/1z3Aawf. On April 3, 2014, by a

bipartisan vote of 11-to-3, the SSCI voted to send the Executive Summary of the

Updated Report to President Obama for declassification and public release. A

member of the SSCI described the report as "profoundly disturb[ing]" and

observed that "much of what CIA officials have said about the effectiveness of coercive interrogations was simply untrue." Press Release, Sen. Wyden, Wyden Statement on the Senate Intelligence Committee's Vote to Declassify its Interrogation Report (Apr. 3, 2014), http://1.usa.gov/1lEpBeH.

On April 7, 2014, Chairman Feinstein transmitted the Executive Summary of the Updated Report to the executive branch. Her accompanying letter to the President stated that she would separately transmit copies of the full Updated Report to the executive branch, and that she "encourage[d] and approve[d] the dissemination of the updated report to all relevant Executive Branch agencies." Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Apr. 7, 2014, ECF No. 41-2, JA 130–31. The Director of National Intelligence, Director of the CIA, Attorney General, Secretary of Defense, and Secretary of State were copied on the transmittal letter. *See id*.

That April 7, 2014 transmittal letter contained no indication that any SSCI committee member objected to providing the Updated Report to the executive branch, nor did it indicate any intent by the SSCI to impose restrictions on the dissemination of the Updated Report either within or outside of the executive branch. *See id.* The CIA received the Updated Report in the summer of 2014. *See* Higgins Decl. ¶ 21, ECF No. 39-1, JA 64.

5

### C.     The SSCI's release of the Executive Summary and transmittal of the Final Report.

The SSCI publicly released the Executive Summary of its final report, along with minority views and the additional views of SSCI members, on December 9, 2014. That release generated extensive world-wide public and media attention to the CIA's cruelty towards its prisoners and deceit towards lawmakers and the American public. *See, e.g.*, Greg Miller, Adam Goldman, & Julie Tate, *Senate Report on CIA Program Details Brutality, Dishonesty*, Wash. Post, Dec. 9, 2014, http://wapo.st/1uhd3ty (describing the SSCI's "exhaustive" description of "levels of brutality, dishonesty and seemingly arbitrary violence that at times brought even agency employees to moments of anguish," and its cataloguing of "dozens of cases" of CIA deceptions); Editorial Board, *The Senate Report on the C.I.A.'s Torture and Lies*, N.Y. Times, Dec. 9, 2014, http://nyti.ms/1uhxqpy ("even after being sanitized by the Central Intelligence Agency itself, [the Executive Summary] is a portrait of depravity that is hard to comprehend and even harder to stomach").

In a foreword to the Executive Summary, Senator Feinstein also described the Final Report, which exceeds 6,900 pages and contains over 37,000 footnotes:

> The full Committee Study also provides substantially more detail than what is included in the Executive Summary on the CIA's justification and defense of its interrogation program on the basis that it was necessary and critical to the disruption of specific terrorist plots and the capture of specific terrorists. While the Executive Summary provides sufficient detail to demonstrate the inaccuracies of each of

6

these claims, the information in the full Committee Study is far more extensive.

Foreword, Executive Summary at 3. Among the matters more expansively detailed in the Final Report are the CIA's efforts to evade oversight for abusive conduct by making misrepresentations to Congress, to other executive branch agencies including the Department of Justice, to the courts, to the media, and to the American public. *See, e.g.*, Executive Summary at 172–73 n.1050, 177 n. 1058.[4]

Senator Feinstein emphasized in her foreword to the Executive Summary that the SSCI's full report "is now final and represents the official views of the Committee. This and future Administrations should use this Study to guide future programs, correct past mistakes, increase oversight of CIA representations to policymakers, and ensure coercive interrogation practices are not used by our government again." Foreword, Executive Summary at 5. Senator Feinstein also explained that she "chose not to seek declassification of the full Committee Study

---

[4] Between April 2014 and December 2014, the SSCI made certain changes to the Executive Summary in anticipation of public release. *See* Connie Bruck, *The Inside War*, The New Yorker, June 22, 2015, http://bit.ly/1MDXFBf (describing negotiations between the SSCI and the executive branch over pseudonyms and redactions). It appears that the SSCI also revised the Updated Report during this period. *Compare* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Apr. 7, 2014, JA 130–31 (describing the Updated Report as exceeding 6,600 pages), *with* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014, JA 133 (describing the Final Report as exceeding 6,700 pages).

at this time," as it would have "significantly delayed the release of the Executive Summary." Foreword, Executive Summary at 3.[5]

On December 9, the SSCI also formally filed the Final Report, *Committee Study of the CIA's Detention and Interrogation Program*, with the Senate. Senator Feinstein's cover letter to the Senate stated that "[t]he entire classified report will be provided to the Executive Branch for dissemination to all relevant agencies. The full report should be used by the Central Intelligence Agency and other components of the Executive Branch to help make sure that the system of detention and interrogation described in this report is never repeated." Letter, Sen. Dianne Feinstein to Sen. Patrick Leahy, President Pro Tempore, United States Senate, Dec. 9, 2014, http://1.usa.gov/1STWp0L.

The following day, the SSCI sent the Final Report to President Obama. Senator Feinstein's transmittal letter stated that "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit." Copies of the letter

---

[5] *See* 160 Cong. Rec. S6405–06 (daily ed. Dec. 9, 2014), http://1.usa.gov/1z3Aawf (during a speech on the Senate floor, Sen. Feinstein described the SSCI's "lengthy negotiation" with the executive branch over redactions in the report).

and the Final Report were sent to each of the Defendants in December 2014.

Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014, ECF No.

41-3, JA 133; *see* Frifield Decl. ¶ 8, ECF No. 39-2, JA 104; Herrington Decl. ¶ 5,

ECF No. 39-3, JA 107; Higgins Decl. ¶ 21, ECF No. 39-1, JA 64; Kadzik Decl.

¶ 5, ECF No. 39-4, JA 111.

      The December 10 transmittal letter contained no indication that any SSCI

member objected to the SSCI's transmittal of the Final Report to Defendants, nor

did it indicate that the SSCI sought to impose any restrictions on the dissemination

of the Final Report either within or outside of the executive branch. *See* Letter,

Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014, JA 133–34.

      According to Defendants' filings in the district court, they have limited the

dissemination of the Final Report within the executive branch. *See* Frifield Decl.

¶ 9, ECF No. 39-2, JA 104–05; Herrington Decl. ¶ 6, ECF No. 39-3, JA 107;

Higgins Decl. ¶ 23, ECF No. 39-1, JA 64; Kadzik Decl. ¶ 7–8, ECF No. 39-4, JA

112.

### D.    The ACLU's FOIA requests and suit.

      In February 2013, the ACLU filed a FOIA request with the CIA for the

Initial Report. JA 68. The agency responded that the report was a "Congressionally

generated and controlled document that is not subject to the FOIA's access

provisions." JA 79. The ACLU filed suit to enforce its FOIA request in November

2013.[6] Several months later, the SSCI completed the Updated Report, and the

ACLU filed FOIA requests with the CIA and the Departments of Defense, Justice,

and State for the "updated version" of the report. *See* Second Am. Compl. ¶¶ 44–

52 (June 5, 2014), ECF No. 28, JA 32–33. With the government's consent, the

ACLU filed a second amended complaint against these four Defendants to enforce

its FOIA request. *See id.* ¶ 6, JA 23. At that time, it was unclear whether

Defendants had in fact received the Updated Report from the SSCI.[7] During an

October 2014 status conference, the parties and the district court agreed that

regardless of when the Defendants received the report, the ACLU would not be

required to file additional FOIA requests for it or to further amend the complaint.

*See* Hr'g Tr., Status Conf., Oct. 7, 2014 at 8:1-25, JA 43. The district court

memorialized its decision in a Minute Order entered on October 7, 2014. *See* JA 9.

---

[6] In its complaint, the ACLU also sought to enforce a separate FOIA request for the
CIA's June 2013 response to the SSCI. The agency later released an unclassified
version of this document to the public, and the ACLU dropped this claim.

The ACLU amended its complaint as of right in January 2014 to enforce a related
FOIA request for the Panetta Review. The ACLU's claim for the Panetta Review is
not at issue on appeal.

[7] Between June and October 2014, counsel for the ACLU asked government
counsel on a monthly basis whether the CIA and other Defendant agencies had
received the updated report. Each time, government counsel's answer was "no."
During an October 2014 status conference before the district court, however,
government counsel explained that the CIA did in fact possess the Updated Report:
"there was a miscommunication apparently within the agency as to what they were
looking for." Hr'g Tr., Status Conf., Oct. 7, 2014 at 7:12-18, JA 42. The CIA had
received the report in the summer of 2014. Higgins Decl. ¶ 21, ECF No. 39-1, JA
64.

Defendants have subsequently interpreted the ACLU's claim for the Updated Report to refer to the Final Report. *See* Defs.' Mot. Dismiss at 3–4 & n.3, ECF No. 39.

In January 2015, all Defendants moved to dismiss the ACLU's claim for the Final Report for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See* JA 10. Defendants argued that the Final Report is a "congressional record" not subject to FOIA. *See* Defs.' Mot. Dismiss at 22–23, ECF No. 39.

### E.    Senator Burr's request for return of the Final Report.

A week before Defendants filed their motion to dismiss the ACLU's complaint, Senator Richard Burr, now Chairman of the SSCI, wrote to the President, requesting the transfer back to the SSCI of all copies of the Final Report in the possession of the executive branch. Senator Burr's letter was made public as an exhibit to Defendants' motion to dismiss. *See* Letter, Sen. Richard Burr to The Hon. Barack Obama, Jan. 14, 2015, ECF Nos. 39-8 & 41-4, JA 10, 136. In his letter, Senator Burr asserted that he had only recently become aware that the Final Report had been sent to the executive branch and sought the return of all copies "immediately." *See id.* He also requested that the Final Report "not be entered into any Executive Branch system of records." *Id.*

11

Several members of the SSCI and other Senators criticized Senator Burr's request. Senator Feinstein, now Vice Chairman of the SSCI, wrote to President Obama, stating that she did not support Senator Burr's request and disputing assertions made in his letter. *See* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Jan. 16, 2015, ECF No. 41-5, JA 138 ("There was never any objection to providing the full, official report to the Executive Branch."). She explained that the purpose of the Final Report "is to ensure that nothing like the CIA's detention and interrogation program from 2002 to 2008 can ever happen again. The realization of that goal depends in part on future Executive Branch decisionmakers having and utilizing a comprehensive record of this program, in far more detail than what we were able to provide in the now declassified and released Executive Summary." *Id.*[8]

### F.     The district court's judgment.

The district court entered judgment for Defendants on May 20, 2015. JA 140. In its analysis of the agency record question, the court considered whether there were "sufficient indicia of congressional intent to control" the Final Report. Op. at 14, JA 154 (internal quotation marks omitted). The court focused on three

---

[8] On January 27, 2015, the ACLU filed an emergency motion to protect federal court jurisdiction over the Final Report, which the ACLU withdrew after Defendants committed to retaining the report pending adjudication of the parties' agency control dispute. *See* Pls.' Notice of Withdrawal of Pls.' Emergency Mot. (Feb. 9, 2015), ECF No. 43.

pieces of evidence: a June 2009 letter from the SSCI to the CIA setting forth the terms for the SSCI's document review at a CIA facility; the December 2014 letter transmitting the Final Report to Defendants; and the SSCI's treatment of the Executive Summary. *See id.* Construing the June 2009 letter as evidence of the SSCI's intent to control the Final Report, the court reasoned that, against this "backdrop," the contemporaneous evidence did not show that the SSCI intended to relinquish control over the document. *Id.* at 18, JA 158. The court concluded that, "[a]bsent more convincing evidence that the SSCI Report has 'passed from the control of Congress and become property subject to the free disposition of the agenc[ies] with which the document resides,'" it is a congressional record not subject to FOIA. *Id.* at 20, JA 160 (citation omitted). The ACLU timely appealed from the portion of the court's order granting Defendants' motion to dismiss. JA 167.

## SUMMARY OF THE ARGUMENT

The issue before this Court is whether the Final Report—a landmark investigation of systemic CIA torture, which is of critical importance to the American public —is an "agency record" subject to FOIA.

The Final Report meets the Supreme Court's definition of an agency record, which requires an agency to have obtained the report and to be in possession of it at the time of the FOIA request. Neither fact is disputed here.

13

The Final Report also satisfies this Court's agency record test, which expands upon the Supreme Court's test when deciding whether an agency has control over a document authored by Congress. Under this Court's precedent, two factors are effectively dispositive: the intent of Congress to retain or relinquish control, and the ability of the agency to use and dispose of the record as it sees fit. This two-factor test ultimately boils down to a question of congressional intent. When Congress clearly expresses its intent to control, the agency cannot lawfully use or dispose of the document as it sees fit. And where Congress's intent is less than clear, this Court has refused to treat records possessed by agencies as congressional documents. Thus, documents transferred from Congress to agencies are presumptively agency records, unless Congress manifests a "clear assertion" of control over them—and the agency bears the burden of establishing this clear assertion of congressional control. In short, this Court's inquiry is a simple one: whether Defendants have met their burden to show that the SSCI clearly asserted control over the Final Report.

Defendants cannot establish the clear assertion of congressional control that this Court's case law requires. The undisputed record in this case is clear. The SSCI relinquished control over the Final Report when it sent the document to the President and the heads of each of the Defendant agencies in December 2014, and explicitly told Defendants to use it "as you see fit" and to disseminate it "broadly"

within the executive branch. In light of this evidence, the Final Report is an agency record.

The district court's holding to the contrary was erroneous for three reasons. First, the court applied the wrong legal standard with respect to congressional intent. Not only did the court fail to require Defendants to show a "*clear* assertion" of congressional control, but its reasoning improperly shifted the burden to the ACLU to show that the SSCI clearly expressed its intent to *abdicate* control—a shift that is contrary to this Court's precedent and the purpose of FOIA.

Second, the district court misconstrued and improperly weighed the record evidence. The court misinterpreted a June 2009 letter from the SSCI to the CIA as an assertion of congressional control—despite the fact that, by its terms, the letter does not apply to the Final Report and was written in a different context. When the SSCI began its study in 2009, the CIA insisted that the Committee's review of agency documents take place on CIA computers at an agency "Reading Room." In order to protect its internal work product during the research and drafting process, the SSCI explained in its 2009 letter that the Committee controlled the documents it stored at the Reading Room. But the Final Report was not one of these documents. More generally, the concerns the SSCI had in 2009 about protecting its work product from CIA employees, when it was conducting its investigation *in a CIA facility*, are far different from its intent in 2014, when the Final Report was

15

completed and transmitted to Defendants. The court also improperly diminished the importance of more probative evidence of the SSCI's intent—the December 2014 letter transmitting the Final Report to the executive branch, and the foreword to the Executive Summary. Although the ACLU need not show that Congress expressly relinquished control over the Final Report, the contemporaneous evidence makes plain that Congress did precisely that.

Third, the court erred in ascribing significance to the SSCI's decision not to seek declassification of the Final Report. For this Court's congressional control analysis, the question is not whether Congress asked the executive branch to declassify the document for broad release to the public, but instead, whether Congress clearly asserted control over the document vis-à-vis the agencies. Classification of the Final Report reflects an executive branch judgment, and the CIA conceded below that the SSCI does not "control" the classification of the information within the report. The SSCI's ability to seek executive-branch declassification is not unique to it, and its decision not to undertake this process is not an assertion of congressional control.

When the SSCI transmitted the Final Report to Defendants and stated they were free to use and rely upon it, the American public acquired a legal right to the non-exempt portions of the Final Report under FOIA. Senator Burr's extraordinary post-hoc attempt to claw back the report from Defendants is entirely irrelevant to

16

this Court's agency record analysis. Similarly, Defendants' own decision to limit dissemination of the Final Report within the executive branch is also of no moment. As Defendants conceded below, the extent to which agency personnel have read or relied upon the Final Report, and the degree to which it was integrated into agency files, are legally irrelevant. And even if these factors were relevant, agencies cannot unilaterally disclaim authority over documents in order to evade their FOIA obligations. Under this Court's precedent, Defendants' litigation strategy decisions are not entitled to any weight.

The Final Report concerns one of the darkest chapters in our nation's history, involving some of the most egregious CIA abuses ever recorded. Release of the report would bring the light of public scrutiny to bear on these abuses, which is precisely the outcome that Congress intended in enacting FOIA: to ensure an informed citizenry, to open the government to the sharp eye of public scrutiny, and to hold the government accountable to the governed.

This Court should reverse the district court's decision.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of a motion to dismiss for lack of subject matter jurisdiction where, as here, the underlying facts are not in dispute. *See, e.g.*, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

17

# ARGUMENT

Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Its basic purpose is "to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976) (internal quotation marks omitted). FOIA is "a means for citizens to know what their Government is up to. This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (internal quotation marks omitted). Under FOIA, an agency must promptly produce "agency records" upon request, subject to certain exemptions. *See* 5 U.S.C. §§ 551(1), 552 (a)(3)(A), (a)(4)(B). But Congress is not an agency, and a congressional record is therefore not subject to FOIA. The question in this appeal is whether the Final Report became an agency record upon transmittal to Defendants.

## I.     The Final Report is an agency record subject to FOIA.

In keeping with FOIA's purpose, "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records.'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). Any uncertainty as to whether a document is an agency record "redound[s]

18

to the benefit of" the FOIA requester. *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 220 (D.C. Cir. 2013).

Although FOIA does not define the term "agency record," the Supreme Court has supplied a clear definition. *See Tax Analysts*, 492 U.S. at 144. A record is an "agency record" for FOIA purposes if it satisfies two requirements: first, the agency must have created or obtained the requested material, and second, the agency must be in control of the material at the time of the FOIA request. *Id.* By "control," the Supreme Court means that "the materials have come into the agency's possession in the legitimate conduct of its official duties." *Id.* at 145. Here, it is undisputed that Defendants obtained the Final Report in the legitimate conduct of their official duties. *See* Defs.' Mot. Dismiss at 11–12, ECF No. 39 (Defendants "do not dispute that [the Final Report] was delivered to them in December 2014").

Expanding upon the Supreme Court's test, this Court typically analyzes four factors to determine whether an agency controls a document. *See Burka v. U.S. Dep't of Health and Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (enumerating factors). However, if Congress authored the contested document, two factors are "dispositive": "(1) the intent of the document's creator to retain or relinquish control over the records"; and "(2) the ability of the agency to use and

19

dispose of the record as it sees fit." *Judicial Watch*, 726 F.3d at 221; *see* Defs.'

Mot. Dismiss at 12 (agreeing that these factors are dispositive).[9]

      This two-factor test ultimately boils down to congressional intent. When

Congress clearly expresses its intent to control the requested document, the agency

cannot lawfully "use or dispose" of the document as it sees fit. *See, e.g.*, *United We*

*Stand Am., Inc. v. IRS*, 359 F.3d 595, 597, 600 (D.C. Cir. 2004) (because Congress

"manifested a clear intent" to control, the agency could not lawfully control the

document). And where Congress's intent is less than clear, this Court has refused

to treat records possessed by agencies as congressional documents. *See, e.g.*,

*Paisley v. CIA*, 712 F.2d 686, 693–95 (D.C. Cir. 1983) (because the government

failed to point to a "clear congressional intent to maintain control," the Court held

that the documents were agency records), *vacated in part on other grounds*, 724

F.2d 201 (D.C. Cir. 1984); *Holy Spirit Ass'n for the Unification of World*

*Christianity v. CIA*, 636 F.2d 838, 842 (D.C. Cir. 1980) ("both the spirit of the Act

and *Goland* [*v. CIA*, 607 F.2d 339 (D.C. Cir. 1978)] require some clear assertion of

---

[9] The third and fourth *Burka* factors are: the extent to which agency personnel have read or relied upon the document, and the degree to which the document was integrated into the agency's record system or files. *See Burka*, 87 F.3d at 515. If this Court were to consider these factors, Defendants' treatment of the Final Report—whereby some of the agencies have not even opened the package containing the document, contrary to the SSCI's contemporaneous intent—is a litigation strategy decision entitled to no weight. *See* Defs.' Mot Dismiss 21–22; *see also Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 44 (D.D.C. 1998) (agencies are not permitted "to evade the FOIA by removing documents from their control after the filing of a FOIA request").

congressional control"), *vacated in part on other grounds*, 455 U.S. 997 (1982);

*see also Judicial Watch*, 726 F.3d at 221 (collecting cases in which documents

were "covered by FOIA only because Congress had not clearly expressed an intent

to retain control over them").

Thus, documents transferred from Congress to agencies are presumptively

"agency records," unless Congress has *clearly* asserted control over them. *See, e.g.*,

*United We Stand*, 359 F.3d at 602 (describing defendants' burden to show "the

clear assertion of congressional control that our case law requires"); *Paisley*, 712

F.2d at 692–93 ("In the absence of any manifest indications that Congress intended

to exert control over documents in an agency's possession, the court will conclude

that such documents are not congressional records.").

The undisputed record in this case is clear: the SSCI relinquished control

over the Final Report when it sent that document to Defendants in December 2014.

Accordingly, Defendants cannot establish the "clear assertion" of congressional

control that this Court's precedents require, and the Final Report is an agency

record subject to FOIA. The district court's holding to the contrary was in error.

## A.  The district court erred by failing to require Defendants to show a "clear assertion" of congressional control.

The district court erred by failing to require Defendants to show a "clear

assertion" of congressional control over the Final Report. *See* Op. at 18–19, JA

158–59; *see also* Defs.' Mot. Dismiss at 13–14, ECF No. 39 (acknowledging the

"clear assertion" requirement). Compounding the error, the court actually turned this standard on its head: it reasoned that when Congress transmits documents to the executive branch "with the understanding" that they will be used internally, "[s]uch tender should not be readily interpreted to suggest more wholesale abdication of control." Op. at 18, JA 158 (citing *Goland*, 607 F.2d at 347–48). The district court's reliance on *Goland* for this proposition was misplaced. In that case, the CIA's possession of a congressional hearing transcript "for internal reference purposes" did not convert the document to an agency record because Congress's intent to control the transcript was "clear." *Goland*, 607 F.2d at 343, 346–48. It is precisely this showing—a clear congressional intent to control—that is absent here. Furthermore, as discussed *infra*, the SSCI transmitted the Final Report to the agencies with the explicit authorization that it should be used as the executive branch "see[s] fit"—which may include the executive branch's release of the report to the public (subject, of course, to appropriate redactions of properly classified information). *See* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014, JA 133.

The district court's reasoning improperly shifted the burden to the ACLU to show that Congress clearly expressed its intent to *abdicate* control—a shift at odds with well-established precedent and the purpose of FOIA. Under the law of this Circuit, the question is not whether Congress affirmatively articulated its intent to

abdicate control, but rather, whether Congress clearly expressed its intent to *retain* control over the document. *See, e.g.*, *United We Stand*, 359 F.3d at 602. [10]

### B.    Congress did not retain control over the Final Report.

The evidence shows that the Final Report is an agency record because Congress did not clearly express an intent to control it. Indeed, far from seeking to control the document, Congress relinquished control when it transmitted the report to the agencies. Defendants have not met their burden of showing a clear congressional assertion to the contrary.

In ruling for Defendants, the district court misconstrued and improperly weighed three pieces of evidence: the SSCI's June 2009 letter to the CIA, the SSCI's December 2014 transmittal letter, and the SSCI's treatment of the Executive Summary. *See* Op. at 14, JA 154. At the outset, the court misinterpreted and overemphasized the oldest "evidence," the June 2009 letter. Next, the court improperly diminished the importance of the contemporaneous evidence—the December 2014 transmittal letter and the foreword to the Executive Summary. The latter evidence, which is most relevant to Congress's intent regarding the Final Report, makes plain that Congress did not intend to retain control over the

---

[10] Later in its opinion, the district court stated that Defendants had "made the requisite showing" of congressional intent to control. Op. at 20, JA 160. But that statement does not change the fact that the district court actually applied a presumption of congressional control rather than a presumption of relinquishment.

document. Finally, the court erred in ascribing significance to the SSCI's decision not to seek declassification of the Final Report.

> **1. The SSCI's June 2009 letter does not relate to the Final Report.**

The district court erred in concluding that the June 2009 letter from the SSCI to the CIA applies to the Final Report. The evolution of the SSCI's investigative and report-writing process—and negotiations with the CIA—helps explain why this is so.

In March 2009, after the SSCI informed the CIA of its intention to conduct a study of the CIA's torture program, the SSCI and CIA engaged in extensive discussions to identify appropriate procedures for the SSCI's review of CIA documents. *See* Letter, Sen. Dianne Feinstein & Sen. Christopher Bond to The Hon. Leon Panetta, June 2, 2009, ECF 39-1, JA 92. Although the SSCI wanted to review these documents in its own offices, the CIA insisted that the SSCI's review should take place at CIA facilities. Higgins Decl. ¶ 10, ECF No. 39-1, JA 58. As the result of an "inter-branch accommodation," the CIA established a "Reading Room" on CIA premises where SSCI personnel could review agency materials. *Id.* ¶ 11, JA 58.[11] Within this Reading Room, the CIA also created a "segregated

---

[11] *See* June 2009 Letter ¶ 2, JA 93 ("CIA will make unredacted responsive operational files . . . available at a secure Agency electronic Reading Room facility (Reading Room) which will permit Committee staff electronic search, sort, filing, and print capability.").

network share drive," which was supposed to allow SSCI personnel to confidentially store their electronic notes, drafts, and other work product. *Id.*

These procedures were memorialized in the June 2009 letter from Senators Feinstein and Bond to then-CIA Director Panetta. *See* JA 92–96. The letter set forth the terms by which the SSCI could access CIA materials, and it established restrictions on CIA access to SSCI documents stored at the agency facility. Most relevant here, paragraph 6 of that letter limited CIA control over two categories of SSCI documents: those generated on or saved to the segregated network drive, and any other documents stored at the Reading Room. Paragraph 6 provided that "these records" were congressional, and not agency, records. JA 93–94.

The district court fundamentally misinterpreted paragraph 6 of the June 2009 letter. According to the court, paragraph 6 the letter shows that the SSCI intended that *any* "final recommendations, reports or other materials generated by Committee staff or members" would remain congressional records in their entirety—regardless of location. *See* Op. at 15–16, JA 155–56 (quoting June 2009 Letter ¶ 6, JA 93). But the full text of paragraph 6 makes plain that it applies only to "final recommendations, reports, or other materials" *in the Reading Room*:

> Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and *will be kept at the Reading Room* solely for secure safekeeping and ease of reference. *These documents* remain congressional records in their

25

entirety and disposition and control over *these records*, even after the completion of the Committee's review, lies exclusively with the Committee. As such, *these records* are not CIA records under the Freedom of Information Act or any other law. The CIA may not integrate *these records* into its records filing systems, and may not disseminate or copy them, or use them for any purposes without the prior written authorization of the Committee. The CIA will return *the records* to the Committee immediately upon request *in a manner consistent with paragraph 9*. . . .

June 2009 Letter ¶ 6, JA 93–94 (emphasis added).

Properly understood, "*[t]hese* documents," "*[t]hese* records," and "*the* records" refer to SSCI documents that were either (i) stored on the network drive or (ii) otherwise "kept at the Reading Room." *Id. These* are the documents that "remain congressional records in their entirety." *Id.* This interpretation is further supported by the fact that, upon the SSCI's request, the CIA was required to return "the records" "in a manner consistent with paragraph 9"—a paragraph that applies only to materials *in the Reading Room*. JA 94. Ultimately, paragraph 6, like several other provisions in the June 2009 letter, was designed to protect the SSCI's internal work product, which it was forced to store at the agency it was investigating and on the agency's computer system.[12]

Indeed, in their motion to dismiss, Defendants made less of the 2009 letter than the district court did. Defendants conceded that the 2009 letter applied to documents created by SSCI personnel on the "segregated shared drive," and

---

[12] *See, e.g.*, *id.* ¶ 7, JA 94 ("CIA will provide the Committee with lockable cabinets and safes, as required, in the Reading Room.").

conceded that the Final Report was *not* one of these documents. *See* Defs.' Mot. Dismiss at 4–5, ECF No. 39; Higgins Decl. ¶¶ 12–14, JA 59–61. And they offered no evidence that the SSCI ever stored the Final Report at the Reading Room. *See* Defs. Mot. Dismiss at 4–5 (as the SSCI drafted the report, "portions of the draft report were transferred from the segregated shared drive to secure SSCI facilities at the U.S. Capitol complex so that the Committee could complete the drafting process in its own workspaces").

It was only in Defendants' reply brief below that they argued, for the first time, that the 2009 letter "covers" the Final Report, *see* Defs.' Reply at 5, ECF No. 49—a contention belied by their own concessions. Even then, Defendants did not contend that they were bound by the 2009 letter in their handling of the Final Report; they argued only that "the government has appropriately relied upon the 2009 agreement to *inform* treatment of all versions of SSCI's work product." *Id.* at 6 (emphasis added). But whatever that may mean, it cannot undermine the plain language of the June 2009 letter, which does not relate in any way to the Final Report—let alone constitute a "clear" and "specific" assertion of congressional control over it. *Paisley*, 712 F.2d at 694–95.

Because the Final Report was not one of "[t]hese documents" referred to in the 2009 letter, that letter is simply not relevant to the question whether Congress intended the Final Report to remain a congressional record. JA 93–94.

**2.    The December 2014 transmittal letter and other contemporaneous evidence reflect Congress's intent to relinquish control of the Final Report.**

Although the ACLU need not show that Congress affirmatively articulated its intent to relinquish control, the record here is clear: the December 2014 transmittal letter, as well as the foreword to the Executive Summary, establish that Congress relinquished control over the Final Report to Defendants. The district court erred in discounting the importance of this contemporaneous evidence.

The December 10, 2014 transmittal letter to Defendants is explicit: "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve this result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit."[13] Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014, JA 133. By encouraging the use and dissemination of the Final Report "broadly" within the executive branch, and by leaving to the executive branch the decision as to how broadly the report should be distributed, and how extensively it should be used, the SSCI explicitly relinquished its control over the document. *Id.* Moreover,

---

[13] Similarly, the SSCI's April 7, 2014 transmittal letter to the executive branch contains no indication of the SSCI's intent to restrict the executive branch's use or dissemination of the Updated Report.

28

the letter specifically gave the executive branch authority to use the full report "as you see fit." *Id.*

The publicly released Executive Summary is likewise evidence of the SSCI's intent to relinquish control of the Final Report. The foreword to the Executive Summary states, for example, that the Final Report "represents the official views of the Committee. This and future Administrations should use this Study to guide future programs, correct past mistakes, [and] increase oversight of CIA representations to policymakers . . . ." Foreword, Executive Summary at 5; *see also* Letter, Sen. Dianne Feinstein to Sen. Patrick Leahy, President Pro Tempore, United States Senate, Dec. 9, 2014, http://1.usa.gov/1STWp0L (stating that the Final Report "should be used" by the CIA and other agencies "to help make sure that the system of detention and interrogation described in this report is never repeated"). These statements show that the SSCI relinquished control of the Final Report.

The district court improperly minimized the significance of this contemporaneous evidence, reasoning that "where SSCI's 2009 letter affirmatively manifests its intent to retain control of its work product," the court should "decline[] to assume the contrary"—notwithstanding the express instructions of the SSCI in 2014. Op. at 19, JA 159. As discussed *supra*, the June 2009 letter does not apply to the Final Report. But even if the 2009 letter had some relevance to the

29

agency record analysis, the December 2014 transmittal letter and the foreword to the Executive Summary are far more probative of Congress's intent.

Indeed, this Court's precedent places particular emphasis on Congress's intent at the time of transmittal—an emphasis that comports with basic evidentiary principles and common sense.[14] Although historical evidence, such as the "circumstances attending the document's generation," may sometimes be relevant to a court's inquiry, *Goland*, 607 F.2d at 347–48 & n.48, in this case, the circumstances surrounding the drafting of the SSCI's internal work product five years earlier are in no way probative of the SSCI's intent for the Final Report.[15]

---

[14] *See Paisley*, 712 F.2d at 694–95 (where the government failed to point to "*contemporaneous* and *specific* instructions" from the SSCI to agencies limiting the use of documents, the court held that the SSCI lacked the requisite "specific intent" to control documents); *Holy Spirit*, 636 F.2d at 842 (letter from Clerk of House of Representatives written after transfer of records did not evince congressional control); *see also United We Stand*, 359 F.3d at 602 (describing the D.C. Circuit's refusal to credit "pre-existing agreements" between Congress and agencies that do not specifically address the particular records at issue). This Court's opinion in *Holy Spirit* is not to the contrary. There, the Court rejected the plaintiffs' argument that a congressional assertion of control had to take the particular *form* of "contemporaneous instructions" to an agency. *Holy Spirit*, 636 F.2d at 842.

[15] In *Goland*, the Court considered "the circumstances attending the document's generation" and "the conditions attached to its possession by the CIA" in concluding that Congress had clearly asserted control over a hearing transcript sent to the CIA "for a limited purpose and on condition of [congressionally imposed] secrecy." *See* 607 F.2d at 348 & n.48. But in *Goland*, unlike here, the circumstances attending the document's generation were highly probative of Congress's intent: they revealed that Congress had relied on its own constitutional authority to maintain the secrecy of the transcript, and this control persisted following transmittal to the CIA. *See id.* at 343, 346–48. Subsequent D.C. Circuit

The concerns the SSCI had in 2009 about protecting its work product *from CIA employees*, when it was conducting its investigation *in a CIA facility*, are far different from its intent in 2014, when its report was completed and transmitted to the President, the Director of National Intelligence, the Director of the CIA, the Attorney General, the Secretary of Defense, the Secretary of State, the Director of the FBI, and the CIA Inspector General, with affirmative encouragement to disseminate it "broadly" within the executive branch. JA 133–34. The district court's contrary reasoning was erroneous.

Finally, even if the district court were correct that the December 2014 letter did not "evince congressional intent to surrender substantial control" over the Final Report, Op. at 18, JA 158, the letter certainly does not constitute the required "clear assertion" of congressional control over the Final Report. *United We Stand*, 359 F.3d at 602.

### 3.     The fact that Congress did not seek to declassify the Final Report for public release is not significant.

Before the district court, Defendants argued that because the SSCI did not vote to seek declassification and public release of the Final Report, the SSCI must have retained control over the document. *See* Defs.' Mot. Dismiss at 18, 21, ECF

---

case law affirmed that, insofar as the circumstances surrounding a document's creation are relevant, it is because they may be probative of Congress's "*continuing* intent" to control a document. *See Paisley*, 712 F.2d at 692 (emphasis added).

No. 39. But this argument wrongly conflates "classification" and "congressional control," and the lack of a Committee vote concerning public release is irrelevant.

For this Court's agency record analysis, the question is not whether Congress asked the executive branch to declassify the document for broad release to the public, but instead, whether Congress clearly asserted control over the document vis-à-vis the agencies. The category of "agency records" under FOIA is not the same as the category of public records; if it were otherwise, there would be no need for FOIA. Furthermore, the record here is clear that the classification of the Final Report reflects an executive branch judgment. As the CIA conceded before the district court, the SSCI does not "control" the classification of the information in the Final Report and cannot declassify the document. *See* Higgins Decl. ¶ 15, ECF No. 17-2, JA 21 ("the Executive Branch does not consider SSCI's control over the document to extend to control over the classification of the information therein"); *see also* Exec. Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009) (Congress is not an "original classification authority").[16]

---

[16] *See also* Decl. of Martha M. Lutz, Chief of the Litigation Support Unit, CIA ¶¶ 6, 8, *Leopold v. CIA*, No. 13-cv-1324 (JEB) (D.D.C. Jan. 21, 2015), ECF No. 34-1 (explaining that the redactions in the Executive Summary concern agency equities); Decl. of Martha M. Lutz, Chief of the Litigation Support Unit, CIA ¶ 3, *Leopold v. CIA*, No. 13-cv-1324 (JEB) (D.D.C. Mar. 4, 2015), ECF No. 38-1 ("due to the public interest in disclosure, the *Executive Branch* made the decision to declassify much of the Executive Summary and to retain the classification only for certain discrete pieces of national security information" (emphasis added)).

Thus, the access restrictions on the face of the Final Report—such as the "Top Secret/Sensitive Compartmented Information" label, *see, e.g.*, Defs.' Mot. Dismiss at 16—reflect the SSCI's acknowledgement of the executive branch's classification decisions; they do not evince independent congressional control over the document. These markings refer explicitly to the executive branch's own classification scheme, and do not originate in Congress's power to keep its deliberations secret, nor do they indicate any congressional control over the Final Report. *Cf. Goland*, 607 F.2d at 343, 346–48 & n.41 (holding that Congress's intent to control a hearing transcript was "clear" where Congress relied on its *own* constitutional authority to designate a transcript as "Secret," and where the transcript could be declassified *only by Congress*); *Paisley*, 712 F.2d at 690, 694 (noting in dicta that documents that "had been classified as 'Secret' *by the SSCI*" were congressional records (emphasis added)). Unlike the defendants in *Goland*, the agencies here made no showing that the SSCI relied on its own authority to designate the Final Report as "classified." If the SSCI had done so, then *only the SSCI* would have the power to declassify the document for public release. *See Goland*, 607 F.2d at 343, 346–48. But, again, the CIA has asserted otherwise. *See* Higgins Decl. ¶ 15, ECF No. 17-2, JA 21.

In the proceedings below, Defendants nevertheless argued that the SSCI's marking of the Final Report as "Top Secret," as well as the SSCI's meeting in

closed session to discuss the report, indicated congressional control. *See* Defs. Mot.
Dismiss at 16. Although the district court did not definitively rule on these
arguments, it noted that they would "not likely gain much traction," because the
ACLU had "persuasively" argued that these indicia of confidentiality merely
reflect the SSCI's acknowledgment of the *CIA's* classification decisions, and thus
fail to reflect *Congress's* intent for the document. *See* Op. at 20, JA 160; *cf.*
*Goland*, 607 F.2d at 343, 346–48 & n.41. The court was correct.

Despite recognizing the weakness of Defendants' classification arguments,
the district court nonetheless twice conflated executive-branch classification with
congressional control. First, in discussing the December 2014 transmittal letter, the
court observed that, "Most significantly, the dissemination authorized by the letter
is limited to the Executive Branch alone. It plainly does not purport to authorize
the agencies to dispose of the Report as they wish—e.g., to the public at large." *See*
Op. at 18, JA 158. This reasoning would be relevant if the SSCI had relied on its
own constitutional authority to designate the report as secret, and if *only the SSCI*
could declassify the report, as in *Goland*. But that is not the case here. *See* Higgins
Decl. ¶ 15, ECF No. 17-2, JA 21. What matters instead is that nothing in the
SSCI's transmittal letter prevents the agencies from initiating the declassification
process—or even suggests that the SSCI would have the power to prevent the
agencies from doing so.

Second, the court concluded that the "SSCI's deliberate decision not to publicly release the Full Report, combined with its assertion that it would consider that course of action in the future," "undermine[d]" the ACLU's contention that Congress intended to relinquish control over the document. Op. at 19, JA 159. But the fact that the SSCI has the ability to initiate a declassification process does not constitute a "clear assertion" of congressional control—particularly because the SSCI's ability to seek declassification is not unique to it. Even "members of the public" may seek declassification of information classified by the executive branch. 32 C.F.R. 1908.01; *see* Executive Order No. 13526 § 3.5(a).

Indeed, the district court's logic would lead to absurd results. Under the court's reasoning, to relinquish control of a classified document to an *agency* for the purposes of FOIA, Congress would first have to seek executive declassification—and perhaps even full public release. *See* Op. at 18–19, JA 158–59. Under this approach, Congress would somehow maintain implicit control over all documents containing information that the *executive branch* considers classified. At the same time, the agencies that classified documents in the first place, and that possess declassification authority over documents authored by Congress, may pretend that it is instead Congress that has imposed restrictions on the agency's use of those documents. Such a rule would provide an end-run around FOIA, obviating any judicial inquiry into congressional intent to retain control

35

over any such documents, unless Congress simultaneously petitioned the agency to declassify them. This would create an illogical double-counting in FOIA, so that an agency's classification of information would be counted both when a court considers whether a document falls within the FOIA exemption for properly classified information, 5 U.S.C. § 552 (b)(1), as well as in determining whether a document is an agency record in the first place. Such a rule also has no limiting principle: a document authored by Congress need only contain a single sentence classified under the Executive Order for an agency to claim that Congress in fact controls the document. When, as here, Congress has relinquished control vis-à-vis an agency, there is no basis in law or logic for placing entire documents that happen to be authored by Congress beyond the ambit of the FOIA.

### C. Defendants may use and dispose of the Final Report as they see fit.

The second agency control factor—the ability of the agency to use the record as it sees fit—also weighs decisively in the ACLU's favor. Unlike the SSCI's transmission of the Initial Report, its December 10, 2014 transmission of the Final Report stated that the executive branch is free to use and rely on the document. *Compare* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 14, 2012, JA 127 (circulating draft version of the document for the purposes of "suggested edits or comments"), *with* Letter, Sen. Dianne Feinstein to The Hon.

36

Barack Obama, Dec. 10, 2014, JA 133 (transmitting the Final Report for executive branch use "as you see fit").

The CIA's filings in this case acknowledge the distinction. When the CIA described the Initial Report, it declared that it "would not be free to disseminate or otherwise dispose of it without approval of the SSCI," even after redacting classified information. *See* Higgins Decl. ¶ 15, ECF No. 17-2, JA 21–22. In addition, the CIA emphasized that before the SSCI transferred the Initial Report, it required the agency to provide a list of personnel who would access the document for the limited purpose of providing suggested edits and comments. *See id.* ¶ 14, JA 20–21; *see also* Ex. E to Higgins Decl., ECF No. 39-1, JA 98. However, the CIA made no such assertions with respect to the Final Report—nor could it, in light of Senator Feinstein's December 2014 transmittal letter. As that letter makes plain, the agencies are not "hold[ing] the document . . . as a 'trustee' for Congress." *Goland*, 607 F.2d at 347. To the contrary, Defendants are free to undertake the executive-branch declassification process, and to otherwise use and dispose of the document as they see fit. *See* JA 133.

> ### 1. Senator Burr's post-hoc attempt to assert control over the Final Report is irrelevant.

As the district court intimated and Defendants effectively concede, Senator Burr's extraordinary post-hoc attempt to assert control over the Final Report has no legal relevance. *See* Op. at 20, JA 160 (Defendants' arguments about Senator

Burr's letter "would not likely gain much traction"); Defs.' Mot. Dismiss at 21–22, ECF No. 39 (Senator Burr's letter merely "underscore[s] the importance of looking to the Committee's official actions."). In fact, this Court has consistently declined to credit post-transmittal, post-FOIA-request assertions of control by Congress. *See Holy Spirit*, 636 F.2d at 842; *United We Stand*, 359 F.3d at 602 (Congress's "post-hoc objections to disclosure cannot manifest the clear assertion of congressional control that our case law requires"); *cf. Paisley*, 712 F.2d at 695 (citing *Holy Spirit*, 636 F.2d at 842, for the proposition that a letter from the Clerk of the House of Representatives written after the transfer of records cannot establish congressional control).[17] The Court's past analysis also applies here for a good reason: if this Court were to accept post-hoc assertions such as Senator Burr's, it would effectively allow for the manipulation of agency obligations and the rights of the American public under FOIA.

Moreover, Senator Burr's unprecedented request to the Executive Branch appears to be aimed at influencing judicial analysis of the third and fourth *Burka*

---

[17] Senator Burr's statement that he considers the Final Report to be a "committee sensitive" document, and Defendants' suggestion below that Senator Feinstein's transmittal of the Final Report could not constitute a release of control over the document, are belied by the record. *See* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Jan. 16, 2015, JA 138; Senate Intelligence Committee Rule 9.7, http://1.usa.gov/1H3Exz7 ("Committee members and staff do not need prior approval to disclose classified or committee sensitive information to persons in the Executive branch," provided that certain conditions are satisfied). Defendants have not indicated that these conditions were not satisfied here.

factors—the extent to which agency personnel have read or relied upon the
document, and the degree to which the document was integrated into the agency's
record system or files—factors that Defendants concede are irrelevant. *See* Defs.'
Mot. Dismiss at 15. This Court should not credit Senator Burr's request in its
agency control analysis.

### 2.    Defendants' unilateral decision to limit dissemination of the report is irrelevant.

Finally, for the purposes of FOIA, Defendants' unilateral decisions to label
the report as a "congressional record" and to limit its dissemination are irrelevant.
*See* Defs.' Mot. Dismiss at 15 (conceding irrelevance of third and fourth *Burka*
factors); Frifield Decl. ¶¶ 8–9, ECF No. 39-2, JA 104–05; Herrington Decl. ¶ 6,
ECF No. 39-3, JA 107; Higgins Decl. ¶ 23, ECF No. 39-1, JA 64–65; Kadzik Decl.
¶ 7–8, ECF No. 39-4, JA 112. Even if these factors were relevant, agencies cannot
unilaterally disclaim authority over documents to evade their FOIA obligations.
*See Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 44 (D.D.C.
1998) (agencies are not permitted "to evade the FOIA by removing documents
from their control after the filing of a FOIA request"). In analogous circumstances,
courts have rejected defendants' reliance on post-hoc expressions of agency
understandings because they "simply indicate[d] the *agencies'* belief that the
documents now at issue are congressional in nature." *Paisley*, 712 F.2d at 695.

Under this Court's precedent, Defendants' litigation strategy is entitled to no weight.

Defendants' efforts to evade FOIA by disclaiming control over the Final Report are also antithetical to the purpose of the law. FOIA was enacted by Congress "to ensure an informed citizenry" and "to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). As the definitive account of the CIA's involvement in one of the darkest chapters in our nation's history, the Final Report is an extraordinarily important agency record—the release of which would open agency action to the light of public scrutiny. That is exactly what Congress intended.

## CONCLUSION

For the foregoing reasons, the district court's order dismissing Plaintiffs' claim for the Final Report should be reversed.

*/s/ Hina Shamsi*
Hina Shamsi
Ashley Gorski
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Fax: (212) 549-2654
hshamsi@aclu.org
agorski@aclu.org

40

Arthur B. Spitzer
American Civil Liberties Union of the
   Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Telephone: (202) 457-0800
Fax: (202) 452-1868
artspitzer@aclu-nca.org

*Counsel for Plaintiffs–Appellants*


Date: November 16, 2015

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P.

    32(a)(7)(B) because it contains 11,623 words, excluding the parts of the

    brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.

    32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because

    it has been prepared in a proportionally spaced typeface using Microsoft

    Word in 14-point Times New Roman.

        */s/ Hina Shamsi*
        Hina Shamsi
        *Counsel for Plaintiffs–Appellants*


Date: November 16, 2015

## CERTIFICATE OF SERVICE

On November 16, 2015, I served upon the following counsel for

Defendants–Appellees one copy of Plaintiffs–Appellants' BRIEF FOR

PLAINTIFFS–APPELLANTS via this Court's electronic-filing system:

> Thomas Gary Pulham
> U.S. Department of Justice
> Civil Division, Appellate Staff
> 950 Pennsylvania Avenue, NW
> Washington, D.C. 20530-0001
> T: 202-514-4332
> thomas.pulham@usdoj.gov

>> */s/ Hina Shamsi*
>> Hina Shamsi
>> *Counsel for Plaintiffs–Appellants*

Date: November 16, 2015

# ADDENDUM

# TABLE OF CONTENTS

Selected Provision from FOIA Definitions, 5 U.S.C. § 551 ................................ A-1

**5 U.S.C. § 551    Definitions**

[Selected subsection provided]

For the purpose of this subchapter—

**(1)** "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

>    **(A)** the Congress;
>    **(B)** the courts of the United States;
>    **(C)** the governments of the territories or possessions of the United States;
>    **(D)** the government of the District of Columbia;

>    or except as to the requirements of section 552 of this title--
>    **(E)** agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
>    **(F)** courts martial and military commissions;
>    **(G)** military authority exercised in the field in time of war or in occupied territory; or
>    **(H)** functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix[.]